## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

B.J. Smith, Bradford Zinn,    )
and Jered Ross,       )
            )
   Plaintiffs,     )
            )
v.           )  **CASE NO. _____**
            )
Highland Community College ("HCC"), )  **JURY TRIAL DEMANDED**
The Board of Trustees for HCC,  )
Russell Karn, Deborah Fox, and  )
Bryan Dorrel,      )
            )
   Defendants.    )

## COMPLAINT

Plaintiffs B.J. Smith, Bradford Zinn and Jered Ross, by and through undersigned counsel, bring this action against Defendants for violation of their federal constitutional and statutory rights, in support of which they allege the following:

## PRELIMINARY STATEMENT

1.  This case arises as the result of a long-standing policy, pattern and practice of racial harassment and racial discrimination by Highland Community College ("HCC" or "Highland") against its student-athletes, the majority of who are African American. Since at least 2019, HCC's administration conducted a concerted campaign to discourage African American student-athletes from attending HCC, intimidate enrolled Black student-athletes into leaving through systemic harassment based on race, and shamelessly coerced its coaching staff to refrain from recruiting prospective African American student-athletes. Indeed, Plaintiffs allege that HCC's Board of Trustees ("Board") hired and conspired with a new administration to accomplish these and other unlawful objectives. Coaches and staff who opposed HCC's discriminatory practices were

disciplined and, in the case of Plaintiffs, had their employment unlawfully terminated by HCC without due process and with clear malicious intent to damage their reputations, discredit their testimony in the attempt to cover-up its campaign of racial harassment.

2.      Among the many unlawful actions taken by HCC was suspending Plaintiffs' employment as the coaching staff for its women's basketball team in mid-season based on bogus allegations of supposed National Junior College Athletic Association ("NJCAA") rules violations involving academic misconduct.

3.      As set forth in detail below, HCC and its Athletic Director, Defendant Bryan Dorrel ("Dorrel") used a three-prong strategy to reduce the number of African American student-athletes by disparately expelling them; subjecting Black prospective recruits to excessive scrutiny, such as background checks, not imposed on white recruits; and directing coaches to recruit white prospective student-athletes over black prospects.  Dorrel regularly directed the football, women's basketball, and men's basketball coaches to recruit "recruit more players who the culture of our community can relate to" and to no longer recruit players who wore their hair in "dreadlocks or wicks," hairstyles popular among African Americans.

4.      Additionally, as detailed herein, the HCC Board of Trustees, led by Defendant Russell Karn, ("Karn") pushed to hire new President Deborah Fox ("Fox") for the specific purpose of implementing the Board's apparent vision to transform HCC into a racially homogenous campus with fewer African American athletes. The Board selected both Fox and Dorrel despite their glaring lack of qualification for their positions because they enthusiastically agreed to execute the racially discriminatory policies alleged here by aggressively retaliating against coaches, including Plaintiffs, who resisted the administration.

5.     Moreover, HCC further retaliated against Plaintiffs in violation of Title IX by suspending Plaintiffs and forcing Plaintiff Smith to coach its women's basketball team alone, without assistance, for nearly half the 2019-20 season. In effect, HCC's Board of Trustees and administration intentionally discriminated against its African American student-athletes because of their race, punished any students or staff who objected without due process, and thereby caused irreparable damage to Plaintiffs' reputations and ability to pursue their chosen profession.  To this day, HCC has never disclosed the nature of the alleged "academic misconduct violations," nor informed Plaintiffs of the reasons for their termination.  Despite applying for literally hundreds of junior college and collegiate coaching positions, because of the reputational injury intentionally inflicted by Defendants, Plaintiffs have been unable to obtain employment in their chosen profession and were even told by prospective schools that were not employable because of bogus NJCAA violations that HCC manufactured out of whole cloth.

6.     Plaintiffs bring this action under 42 U.S.C. §1983 for violation of their federal constitutional and statutory rights, including specifically deprivation of a protected property interest in continued employment and liberty interest to be free from government defamation without due process in violation of the Fourteenth Amendment to the United States Constitution. In addition, Plaintiffs assert claims for unlawful discrimination and retaliation based on race in violation of 42 U.S.C. § 1981, Title VI of the Civil Rights Act, 42 U.S.C. §2000d ("Title VI") , for civil rights conspiracy pursuant to 42 U.S.C. 1985(3), and for retaliation in violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) ("Title IX").

## JURISDICTION AND VENUE

7. This Court has original jurisdiction of the federal questions presented herein pursuant to 28 U.S.C. §§ 1331, which confers on district courts subject matter jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States.

8. This Court also has subject matter jurisdiction pursuant to 28 U.S.C. § 1343, which gives district courts original jurisdiction over: (a) any civil action authorized by law to be brought by any person to redress the deprivation, under color of any state law, statute, ordinance, regulation, custom, or usage, of any right, privilege, or immunity secured by the Constitution of the United States or by any Act of Congress providing for equal rights of citizens or of all persons within the jurisdiction of the United States; and (b) any civil action to recover damages or to secure equitable relief under any Act of Congress providing for the protection of the civil rights.

9. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), since all Defendants reside or resided in this district and the events giving rise to the claims occurred in this district.

## THE PARTIES

10. Plaintiff B.J. Smith ("Coach Smith") is a resident of Highland, Kansas, and former head coach of women's basketball at HCC.

11. Plaintiff Bradford Zinn ("Coach Zinn") is a resident of Garden City, Kansas, and former assistant coach of women's basketball at Highland.

12. Plaintiff Jered Ross ("Coach Ross") is a resident of Leavenworth, Kansas, and former assistant coach of women's basketball at HCC.

13. Defendant HCC is a community college located in Highland, Kansas, and established and existing under the laws of the State of Kansas and pursuant to the Kansas Community College Act, K.S.A. §§ 71–120 et seq. & 71–702.

4

14.     HCC is a "person" within the meaning of 42 U.S.C. § 1983.

15.     HCC is and has been at all relevant times a recipient of federal funding.

16.     Defendant Deborah Fox is the President of HCC and has served in this position since August 2019.  At all relevant times, Fox was acting under color of law. She is sued in her official and individual capacities.

17.     Defendant Bryan Dorrel is the Athletic Director of HCC and has served in the position since September 2019.  Dorrel had authority to formulate policies and implement practices related to student-athlete recruitment, conduct, and eligibility. At all relevant times, Defendant Dorrell was acting under color of law.  He is sued in his official and individual capacities.

18.     Defendant Russell Karn ("Karn") is a long serving member of the Board of Trustees.  At all relevant times, he was acting under color of law and is sued in his individual capacity.

19.     Defendant Board of Trustees is the statutory governing body for HCC.  In addition to Karn, the Board included President Tom Smith, Vernie Coy, Charles Huss, Jason Taylor and Carl Tharman.

20.     At all relevant times, the Board was acting under color of law and has the capacity to sue and be sued pursuant to K.S.A. 71-201(a)(3).

## FACTUAL ALLEGATIONS

### Introduction

21.     HCC is a two-year junior college located in Highland Kansas, a rural community in the northeast of the State with a population of just over 1,000. The racial makeup of the city as

of the 2010 census was 84.7% White, 10.0% African American,[1] 1.1% Native American, 0.4% Asian, 0.8% from other races, and 3.1% from two or more races. Hispanic or Latino of any race were 2.0% of the population.

22.     HCC is a member of the National Junior College Athletic Association ("NJCAA") and competes in the Kansas Jayhawk Community College Conference ("JCCC" or "Jayhawk Conference"), which is comprised of two-year schools across the State.[2]

23.     HCC enrolls just over 3,200 students, 87% of whom are white. Less than 6% of the student body is African American, and the school has a diversity score 0.24—nearly one-half the state average for community colleges. Notably, the vast majority of the HCC's student-athletes in recent years have been African American.

24.     In fall 2019 Coach Smith was entering his ninth season coaching the HCC women's basketball team (known as the "Scotties").  He led the Scotties to a 35-1 season in 2017-18 in which the team finished third at the NJCAA Division II National tournament. Smith owns two KJCCC titles, three Region titles and three National tournament appearances as Highland coach (2013 - 5th place; 2014 - 2nd place & 2018 - 3rd place). Most recently Smith guided the Scotties to a 24-5 record and Region VI runner-up finish in the 2018-19 season.

---

[1] Then as now, the overwhelming number of student-athletes at HCC were African American. Because they were required to declare Kansas residency, they comprised nearly 10% of the population.  However, on information and belief, there were and are only a handful of African American residents actually living year-round in Highland.

[2] In or about 2015, then Garden City head football coach Jeff Sims demanded the Jayhawk Conference change their scholarship restrictions to unlimited out-of-state scholarships. He claimed the residency limitation was discriminatory and, in fact, traced its origins to the early 1960s and pointed to statements by then-conference officials who all but conceded that the rule was adopted for expressly this purpose. After Coach Sims and the NAACP threatened suit, the conference capitulated, removing the 20 out-of-state scholarship restrictions, and essentially removing all limits on the recruitment of out-of-state student-athlete. Dramatic change ensued. For instance, by the fall of 2019, of the 114 student-athletes participating in the Highland Scotties football program, the vast majority were from out of state, and 104 were African American.

25.    Smith in his tenure at Highland etched his name in the record books as the winningest coach in program history with a 228-35 record while at Highland including a 126-8 mark at home and 66-23 record in KJCCC play (numbers are entering 2019-20 season).  He has guided the Scotties to the five best seasons in school history including the 2017-18 season's 35-1 mark, the most wins ever for the Scotties in a single season—a season where they also broke ten other single season team records and several more individual single season and career records, along with winning Highland's first outright JCCC title and Region VI title, as well as taking third place at NJCAA DII National tournament.

26.    Previously, in 2011-12, Coach Smith's first at HCC, the Scotties finished with a record of 28-4, finished second in the Kansas Jayhawk Community College Conference, achieved a top five national ranking for most of the season, and had the Jayhawk Conference Player of the Year.   For these accomplishments, Smith was named the Women's Basketball Coaches Association National Coach of the Year. The next season, in 2013, he guided the Scotties to their first National tournament in 30 years and a 5th place finish.   In 2014, he coached the Scotties to their then best season in school history (33-3), winning their first Jayhawk Conference Championship, back-to-back Region Championships and National Runner-up at the 2014 NJCAA Tournament—a year in which the Scotties were ranked No. 1 in the Nation and among the top 5 for the entire season. For his efforts, Smith was named the 2013 and 2014 Region 6 Coach of the Year. As a community college head coach, Smith has five national tournament appearances and two National Runner-up finishes.

27.    While at Highland, Smith coached 13 All-Americans, 20 All-Conference players, 23 All-Region players, three KJCCC Players of the Year and three KJCCC Freshman of the Year.

He also sent 13 players to Division I programs and 32 players to four-year programs and a few more to professional teams overseas.

28.     As a community college head coach, Smith has graduated 100% of his players who have come to play for him as freshmen, and who went on to play at NCAA Division I schools places such as Kansas, Oklahoma, Memphis, DePaul, Arkansas State to name a few.  He was co-founder of the Oklahoma Indian All-State Games and has held numerous free basketball clinics not only in his native Oklahoma, but also in New Zealand and Australia.

29.     Prior to Smith's arrival at HCC in 2011, the women's basketball team had not had a winning season in over 15 years.

30.     Coach Jered Ross attended Highland from 2013-14 and served as a practice player for Coach Smith and the women's basketball team, which finished the season as national runner up.  Coach Smith hired Ross as an Assistant Coach in June 2019.  Ross is a third-generation coach.  Before joining Coach Smith's staff, Ross gained coaching experience as a student assistant for the Missouri Western men's program for the 2015-16 season and before HCC, spent the past three years as part of the coaching staff at Class 5 St. Joseph Central High School with the girls' program.

31.     Coach Ross had primary responsibility for helping players with their academics

32.     Ross was named "a young coach to watch" by World Exposure Report in November of 2019.  Because of the acts of Defendants and defamatory statements alleged herein, Ross's promising career is likely over just as it was beginning.

33.     Coach Brad Zinn joined Coach Smith's staff in 2017.  Coach Zinn's primary areas of responsibility included skill development, strength conditioning and recruiting, in which he excelled in persuading prospective student-athletes from disadvantaged backgrounds and inner-city neighborhoods to attend Highland.  Most of Coach Zinn's recruits were African American.

34. Despite Coach Smith building HCC's women's basketball program to an elite level, as further alleged herein, he was forced out for fighting back against its discriminatory recruiting practices, among other instances of harassment and discrimination of current and prospective student-athletes of color.

### The Deborah Fox Administration

35. In or about early 2019, former HCC President David Reist retired from his post.

36. On information and belief, the HCC Board of Trustees, at the instigation and/or direction of Defendant Karn, hired Defendant Deborah Fox as Reist's replacement for the upcoming 2019-2020 academic year. HCC did so for the specific purpose of implementing a strategy to drive away African American student-athletes from HCC and, in effect, attempt to "make Highland white again."

37. Fox had no prior experience as a college President, Vice President, or other high-ranking administrative position at the collegiate level. Prior to being hired by HCC, Fox worked as a finance administrator for the Independence, Kansas School District. Eight years before that she was a vice president of finance at HCC.

38. Shortly after Fox was hired, then Athletic Director Tyler Nordman abruptly resigned.

39. A search committee was formed to select a new Athletic Director, which included Coach Smith, former head football coach Aaron Arnold, men's basketball coach Jerre Cole, and athletic trainer Tia Collins.

40. Fox immediately and openly circumvented the search committee, hiring her friend, Bryan Dorrel, as HCC's new Athletic Director. Specifically, Fox forbade the search committee

from even advertising the position nationally. The committee had only interviewed three candidates when Fox announced that Dorrel had already been hired.

41.     Upon information and belief, Dorrel had never applied for the Athletic Director position when HCC hired him, the search committee never met or interviewed him, nor did they ever see his resume.

42.     Dorrel had *no* prior experience in athletics administration, either as an Athletic Director or Assistant Athletic Director. Previously, Dorrel's relevant experience was limited to being an athletic trainer, most recently for the Northwest Missouri State University football team, where his brother was head coach.  Upon information and belief, Dorrel had been unemployed for some period before Fox selected him as Athletic Director.

43.     Coach Smith had an initial meeting with Dorrel in or about September 2019. Despite never having met one another, Dorrel lashed out at Coach Smith for no apparent reason, stating that he "lacked integrity," that his "players were an embarrassment in our community," and that Coach Smith needed to "start recruiting more players the culture of the community could relate to."  Coach Smith asked Dorrel to clarify his statement, saying that "I am not sure what you mean." Dorrel responding "you know exactly what I mean."

44.     In early fall 2019, another coach at HCC reported to Coach Smith that Defendant Fox told him that: "I need to find a way to fire coach BJ Smith because the fans and players would never approve of it."

45.     At various points during the same year, Board member and Defendant Russell Karn falsely told other members and members of the community that Coach Smith had acquired a car for former player Nicci Ramalho from a stolen car syndicate.  Karn's statement was untrue, was made with obvious malicious intent and constituted defamation *per se* under Kansas law.

46.     During the fall recruiting period, Coach Smith secured commitments from two stand-out players from the Kansas City area.  Both were African American.  Upon learning this, Dorrel approached Coach Smith and asked if "these are really the kind of players we want at Highland?"  Smith responded that they were the kind of players he and his staff wanted.

47.     In another instance, Coach Smith nominated one of his players for an academic scholarship.  The young woman he nominated, who happened to be African American, excelled academically and athletically, earning nearly all As while at HCC.  However, the administration overrode Coach Smith's election, choosing instead a white student whose GPA was significantly lower.

48.     Through his words and actions over the coming months, Defendant Dorrel would leave no question the kind of players that he and the Highland administration really desired; that is, white student-athletes.

### HCC First Retaliates Against
### Head Football Coach Aaron Arnold

49.     In fall 2019, head football coach Aaron Arnold was beginning his 9th season at Highland.

50.     In late October 2019, the HCC football team under Arnold had achieved a 5-2 record and had just defeated the No. 1 team in the country to earn a top-10 ranking.

51.     Through out the season, Dorrel went out of his way to go around Arnold and directly harass, discipline, and drive away African American team members.

52.     For example, following a loss to Garden City Community College, HCC's starting quarterback, Joe Cambridge (who was African American), complained about the officiating to referees. The Highland Chief of Police, Brandon Whetstine, overheard Cambridge's comment and reported it to Dorrel, who—with consulting with Coach Arnold, urged the officials file a report,

although they had not planned on it. Coach Smith overhead the head of officials call Arnold to say that he did not want to report Cambridge but that Dorrel was insistent that he do so.

53. The report was filed and Dorrel submitted it to the NJCAA for a ruling, which resulted in Cambridge being assessed a two-game suspension.

54. Further, in addition to the suspension, Dorrel tried to have Cambridge expelled from HCC for the incident. Upon learning this, Coach Arnold approached Fox and told her that he would not support this or other disciplinary action against Cambridge.

55. Previously, following the first game of the season, Cambridge had been arrested by Highland Police for allegedly "interfering with a traffic stop," although he was across the street on a public sidewalk at the time.

56. Coach Arnold also reported numerous similar incidents of harassment against his African American players and complained to witnesses that Dorrel had suspended some of them for petty and/or pretextual incidents, while white student-athletes were never questioned or punished over much more serious misconduct.

57. For example, Dorrel directed Arnold to suspend several players because Highland Police Chief Whitestone had told him they were spotted in a city park and "smelled like weed." When Coach Arnold refused to comply, Dorrel told him that, if he wished to keep his job, he would suspend whomever he was told.

58. Dorrel also regularly reprimanded Arnold's African American assistant coaches for using "vulgar" language and failing to address him with what he regarded as the proper level of respect.

59. With three weeks remaining in the season, Coach Arnold was told by Fox that his contract would not be renewed, and he was forced to resign in or about November 2019 for refusing

to follow HCC's racially discriminatory practices and continuing harassment of African American student-athletes.

60.     All but one of Arnold's coaching staff was also forced out by HCC; the majority were African American.

61.     Arnold left HCC as the third-winningest football coach in program history. The football team finished the 2019 season 6-4 and claimed victories over two top-10 teams.

62.     Jeff Hancock was hired to replace Arnold. Hancock's football team went 1-6 the 2020-21 season and 2-7 this past season.  Predictably, the racial demographic among Hancock's recruiting classes looked dramatically whiter than in prior years under Arnold.

63.     After Coach Arnold's ousting, Dorrel continued to pressure remaining HCC coaches to stop recruiting players with "wicks and dreads" in favor of white student-athletes.

64.     On one occasion, Dorrel flatly stated to at least two coaches that it was important the school keep football players Antoine Thompson, Brian George, and Billy Joseph off-campus for the Spring semester because they were "bad people."  All three players were African American, and all wore their hair in either wicks or dreads.

**Plaintiffs' Unlawful Suspensions**

65.     In or about December 2020, at the semester break, Coach Smith's Scotties were 13-0 and ranked Number 5 in the nation.

66.     The team went on to finish the 2019-2020 season with a record of 21-3 and still in the hunt for post-season play when the COVID-19 pandemic cut short the-season.  Coach Smith achieved this success notwithstanding HCC's persistent efforts to undermine him with no concern for the harm to the young women who played for him.

67.     In December 2019, Coach Smith was told by President Fox that the women's basketball coaching staff were suspected of violating NJCAA "academic dishonesty" bylaws.  Fox said the school was still "investigating" the matter and refused to disclose to Plaintiffs any further information or details as to the nature of the alleged violations.

68.     Despite a still "ongoing" investigation and without providing Plaintiffs notice or the opportunity to be heard, HCC immediately suspended the employment in mid-season, ordered them to stay off campus and to have no contact with the team or school staff.

69.     HCC ultimately abandoned attempting to prove a NJCAA academic conduct violation and no such violations were ever found to have occurred.

70.     Fox gave no information on what procedures, if any, HCC intended to use to investigate and adjudicate these serious allegations against Plaintiffs, nor any timeline for doing so.

71.     Coach Smith asked Fox why HCC was not providing Plaintiffs the same employee disciplinary procedures and protections it otherwise applied to faculty. For reasons unapparent, President Fox told Coach Smith that HCC simply did not make that process—or any other—available to coaches.

72.     Fox, Dorrel and others falsely stated publicly on numerous occasions that the women's coaching staff had been doing players' homework—a rules violation never alleged or found—with the intention and purpose of damaging Plaintiffs' reputations.

73.     Immediately after Plaintiffs' suspension, in a telephone call between Dorrel and the father of the highest-rated Kansas recruit in the history of the school, Kate Ogle, Dorrel falsely told the father that Plaintiffs were guilty of "extensive abuses" and recommended that she transfer from Highland.  Ogle in fact transferred in a matter of days after that call.

74.     During the first month of Plaintiffs' suspensions, the women's team was forced to cancel five games.

75.     In late December 2019 Fox emailed the women's team that the coaching staff had been placed on paid leave "pending the NJCAA and internal investigation concerning alleged academic dishonesty."[3]

76.     The team had been scheduled to return to campus on December 28, 2019, but Fox told them instead to report on January 3, 2020, effectively canceling several planned practices.

77.     In or about early January 2020, Assistant Men's basketball Coach John Oler was appointed briefly as interim coach.

78.     Upon information and belief, before terminating Coach Smith, HCC offered interim head coach John Oler the position, which Oler declined.

79.     HCC offered Oler Coach Smith's position even though Oler had previously been fired as the head coach of men's basketball at Kansas City, Kansas Community College for gross violation of the same NJCAA student-athlete housing rules that Fox later and falsely accused Coach Smith of breaking after she was unable to produce any evidence of "academic misconduct" or any related NJCAA rules.

**Fox and Dorrel Meet with Players and Parents**

80.     On January 4, 2020, the women's team met with Fox, Dorrel and interim coach John Oler.

---

[3] At various times throughout the above events, Fox and Dorrel would refer to an "investigation" conducted by the NJCAA, a process that literally does not exist. Unlike the NCAA, the NJCAA has no enforcement staff to investigate alleged rules violations.

81.     President Fox told the team that HCC was provided information in the fall semester "that academic dishonesty occurred" and that Plaintiffs had been suspended before the Christmas as a result.  Fox further stated that "the information we were given is pretty severe and pretty solid."

82.     When players questioned why their coaches were suspended at the mid-season for violations Fox described as occurring in the fall or perhaps even the year before, Fox refused to answer.  She also declined to answer any questions regarding the nature of the alleged violations or explain whether any players were involved or faced eligibility issues.

83.     On January 6, 2020, Fox and Dorrel met with the parents of players to likewise inform them the coaching staff had been suspended pending an investigation into charges of academic misconduct.

84.     Fox told the parents that information was presented to the school in the fall semester "regarding uploading by coaches of student work or presenting it as student work."

85.     In regard to Plaintiffs' suspensions, several parents asked why it occurred mid-season when HCC claimed its "investigation" began months before, a question which Fox avoided answering. Likewise, another parent pointed out the colleges rarely if ever suspend coaches alleged but unproven violations of NCAA and NJCAA—citing Bill Self and the University of Kansas as a current example.  Fox evaded answering that question as well.

86.     Fox and Dorrel attempted to justify the suspensions saying HCC was acting to appease the NJCAA and to avoid having to forfeit any victories in which ineligible players might participate in their remaining games.  This statement was clearly pretextual because every member of the team played anyway through the end of the season and this purported "risk" would remain regardless of Plaintiffs' suspensions.  And, as alleged above, HCC never proved even one NJCAA academic honestly bylaws.

87.     Defendant Fox and Dorrel made numerous false and defamatory statements to parents.

88.     For example, Dorrel stated that Plaintiffs' suspension was "not an easy decision, but the only person that's responsible for this is B.J. Smith," and that "as far as the information we do have is egregious enough that it warranted suspension right now."  He described the inculpatory evidence he claimed the school developed so far as "ample" and that it was "just one instance—this [the alleged misconduct] has not even been looked at with previous seasons."

89.      Dorrel further represented that "there was so much information that it was not even … it's the worst thing I've ever seen."  When pressed by another parent, he responded "Ma'am, I have been in college sports for 25 years."  Dorrel called the supposed violations by Plaintiffs "obvious, flagrant and intentional."

90.     The foregoing statements by these Defendants were false, made intentionally and with malice and intended to and did cause Plaintiffs serious reputational injury.

### January 2020 Board of Trustees Meeting

91.     On or about January 8, 2020, HCC issued a press release stating Plaintiffs had all been suspended pending an investigation into alleged NCJAA rules violations involving academic misconduct.

92.     Coach Smith was asked to meet with the Board in executive session on or about January 14, 2020.  When Coach Smith asked if he was allowed to have his lawyer present, his request was denied without explanation.

93.     Plaintiffs Zinn and Ross were also summoned before the Board and, like Coach Smith, their requests to have an attorney present was denied by Defendants.

94.     Plaintiffs had no advance notice of either the purpose or the subject matter of the Board meeting, and still lacked notice of the nature of the claimed academic rules violations.

95.     At the meeting, Board members admitted that HCC's purported "investigation" failed to reveal any NJCAA academic misconduct violations, nor did the Board inform him of any other alleged violations of NJCAA bylaws.

96.     Coach Smith met with President Fox again on or about January 18, 2020, when she informed him that he would be reinstated the next day.  He asked when Zinn and Ross would return.  Fox responded that "we're going to hold off on your assistants for now. . .. they have been active in a lot of girls' accounts and the Board has some concerns about that."  Fox stated that she hoped both assistants would be returning in 7-10 days, telling Coach Smith that neither appeared to have violated NJCAA rules, but did violate HCC student identity policies, "so I don't believe at this point were going to hear anything from the NJCAA."

97.     Smith told Fox that "at some point, I need my name cleared publicly," to which Fox didn't respond.

98.     Coach Smith was reinstated on or about January 19, 2020.  However, Ross and Zinn remained suspended.  They were never told the reason.

99.     After Coach Smith was reinstated, Defendant Dorrel continued making disparaging and defamatory statements about Smith's character and integrity, falsely accused Smith of previously violating NJCAA extra-benefit rules by providing one of his players a car which Dorrel claimed without basis was "stolen."  Moreover, Dorrel and another HCC employee, Kristie Kelly-Blevins, posted defamatory statements on this and other false accusations on social media through the latter's Twitter account.

18

100.    On one occasion, Coach Smith learned from a prospect that a competing coach had told her he would be fired the next meeting of the Board, knowledge that could only come from someone at HCC.

101.    In addition to never having been given notice of the allegations against them, Plaintiffs were not apprised of the procedures HCC would ostensibly follow, the timeline for the investigation or what procedures HCC would use to adjudicate the allegations.

102.    HCC failed to follow its own rules and policies regarding these and related matters and left Plaintiffs' fate to the whim of President Fox and her administration.

103.    However, there is no evidence that anyone at HCC engaged in any investigation of the allegations.  Damningly, HCC failed to interview *a single member of the women's basketball team,* including the two players *who were supposedly involved in the instance[s] of academic fraud.*  Nor did any representative of HCC interview Plaintiffs regarding these allegations, let alone inform them of their nature before suspending the entire staff.

104.    On February 21, 2020, HCC issued a statement on social media as follows: "We would like to thank the HCC student athletes for their cooperation during the investigation."  This statement is false because the school never bothered to interview a single member of Coach Smith's team, who were all off-campus on break at the time.

105.    Upon information and belief, HCC failed to *ever* interview even one of Coach Smith's players, including the two allegedly involved in the rule violations.

106.    Likewise, in the same statement, HCC said that it  "would like to thank the parents of the student athletes and the patrons following the program, for their insight and contributions to reporting possible violations.  Upon information and belief, the school never interviewed any

player parents regarding its "investigation" and there is no record of any "reporting" possible violations to HCC at any relevant time herein.

107.    To this day, HCC has never disclosed to Plaintiffs the identity of any supposed witnesses nor the subject matter of their testimony, even though the "conclusion" of HCC's investigation resulted in Plaintiffs' termination.

108.    On information and belief, notice and/or correspondence falsely stating that Plaintiffs violated NJCAA rules was placed into their respective personnel files.

109.    Previously, HCC had never been accused of NJCAA violations within its women's basketball program under Coach Smith.  Likewise, neither Coach Zinn or Coach Ross had ever been accused of or investigated for NJCAA rules violations in their respective careers.

110.    Under NCJAA rules, an accused coach has no right to challenge a self-reported violation by his or her institution.

111.    On behalf of himself and his staff, Coach Smith contacted the NJCAA directly to inquire about the alleged violations but was told he had no direct means of challenging them and had to rely on HCC to do so.

112.    In or about early February Coach Ross took his concerns about the racially toxic environment at HCC to the media.

113.    In a Kansas City Star article published on February 15, 2020, Ross was quoted as saying that "while racial tension is natural in an environment such as this, it is an open secret that on and around the main campus in Highland, black students are often subject to scrutiny without cause from campus security officers and other authorities."  "I've had some friends that have been through some bad things up there," he said. Ross said he finds it hard to believe that the

administration isn't aware of this problem. However, the college has repeatedly denied these allegations.

114.    "Everything that they (campus security officers) do, they have to get permission from the administration to go forward with," Ross told the Star. "I'm not too sure that they can walk into somebody's dorm without permission. So yeah, I'm pretty sure that (administrators) know everything that's going on." Ross said he has spoken with students who have had their dorm rooms entered and searched in what he considers to be fishing expeditions for evidence of campus policy or criminal violations, without probable cause. Ross said other students have had their vehicles entered, searched and/or towed, also without apparent justification.

115.    Ross previously told Atchison Globe of this alleged climate of racial unfairness, including the allegedly unjustified searches and tows.

116.    Coach Zinn similarly filed a complaint with the NAACP concerning the discriminatory and hostile racial environment at HCC arising from or relating to the events alleged herein.

117.    Upon information and belief, HCC's decision not to reinstate and subsequent decision to terminate Ross and Zinn was motivated by racial animus and in retaliation for their engaging in protected activity.

**Fox Fires Coach Zinn and Coach Ross**

118.    In about early March 2020, Fox met with Coach Zinn to inform him that HCC would not be renewing his contract and offered him the opportunity to resign.

119.    Zinn objected that he had no warning and no opportunity to meet with a lawyer. When Coach Zinn asked, "why was I suspended?" Fox flatly told him that "*we're not going to reveal that.*"

120.    Fox gave Coach Zinn 24-hours within which to respond to her ultimatum.  She also told him he had to vacate his campus housing within 10 days.

121.    HCC never provided a reason for Zinn's suspension prior to any investigation, nor did it ever disclose why he was dismissed before it was complete.

122.    To the contrary, on or about March 24, 2020, Coach Zinn had a telephone conversation with President Fox in which she stated there were no findings against him specifically by the NJCAA. He asked her to confirm this fact in writing, to which she agreed.   The next day Zinn wrote back thanking Fox for her response and asking again that she state in writing that there are no findings or sanctions against him by the NJCAA.

123.    Regarding the ongoing HCC "investigation," Zinn also asked Fox to elaborate on or provide more specifics of what he had been accused of in terms of academic dishonesty or other claims.  Fox never responded.

124.    Moreover, as alleged above, Fox even told Zinn that he was found not to be involved in any NJCAA violations but refused to confirm her statement in writing and fired him anyway.

125.    At around the same time, Fox also informed Coach Ross that HCC would not be renewing his contract and that he faced the same choice as Zinn; that is, Fox told Coach Ross that he could resign his job immediately or stay suspended until his contract expired at the end of the season. As she did with Coach Zinn, President Fox gave 24-hours to decide

126.    When Coach Ross asked the reason why, Fox refused to say, stating that she was not required to explain herself to him.

127.    HCC also evicted Ross from his campus housing with only 10 days' notice in the middle of winter, during a deadly pandemic.

128.    Further, HCC decided to evict Zinn and Ross even though its supposed "investigation" was ongoing, and neither was ever found to have violated any NCJAA rule, a fact that President Fox personally confirmed to Zinn.

129.    HCC had no written lease agreement with Coach Zinn or Ross, who were therefore month-to-month tenants under Kansas law.  HCC's decision to evict them both on short notice of just 10 days accordingly violated Kansas landlord-tenant law.  *See* K.S.A. 58-2570 (requiring 30-days' notice) and breached the parties respective oral lease agreements.

130.    HCC's eviction of Plaintiffs Zinn and Ross from their campus housing was motivated by racial animus and in retaliation for engaging in protected activity in opposing its racist agenda.

131.    President Fox also contacted the Jayhawk Conference Commissioner and falsely stated that there were "serious rules violations within the HCC women's basketball program" and she was trying to clean up "some really bad stuff."

132.    During this same time frame, on information and belief, Defendant Dorrel posted numerous derogatory and defamatory statements about Coach Smith on social media via his then girlfriend's Twitter account.

133.    In or about June 2020 Fox demanded that Coach Smith resign, or his contract would not be renewed.

### Title IX Retaliation Against Smith

134.    As alleged above, Plaintiffs were suspended without due process in December 2020.  As part of their suspension, Plaintiffs were not allowed to contact any players, any staff, or parents of players.

135.    The suspensions immediately and negatively impacted the women's team, denying them the benefits of their education and equal treatment.

136.    In early March 2020, with the understanding he would remain anonymous, Coach Smith filed a complaint with the NAACP describing the hostile environment at HCC and possible Title IX violations arising from its treatment of the women's team.

137.    On or about March 15, 2020, the Kansas City Star published an article titled "No Dreadlocks Allowed?" regarding allegations of discrimination at Highland.  The article identified Coach Smith as the party who reported possible Title IX violations to the NAACP.

138.    Because the coaching staff was not allowed to have any communication with players, they were unable to provide academic guidance to the serious detriment of their players. Rather than their coaches, unknown HCC staff or staffers attempted to assist the students in enrolling but botched the task, adversely affecting each young woman's future by jeopardizing their academic eligibility to continue playing at four-year institutions.

139.    As a result of the events alleged herein, none of coach Smith's freshman players returned for 2020-21.

140.    Additionally, several of Coach Smith's sophomores who ordinarily would have gone on to play at four-year schools and even at the NCAA Division I level but did not because of HCC's violations of Title IX and failure to ensure that the young women received the benefit of the educational program and activities HCC was legally obligated to provide.

141.    Coach Smith's suspension was lifted in late January 2020, but Plaintiffs Zinn and Ross remained suspended through the end of the year.

142.    Coach Smith's emails to Fox asking when his assistant coaches would be able to return went unanswered.

143.    Facing the prospect of coaching the team by himself, Coach Smith repeatedly asked Fox for authority to hire new assistant coaches.  Fox denied his request and refused to state the reason.

144.    While HCC told Smith that former interim coach John Oler would try to help, he provided only minimal assistance.  Oler attended less than 10% of practices, performed no scouting, no game planning, no skill development work, and no administrative duties.  Further, Oler only sat with the team during games when the men's team was playing in the same venue.

145.    As a solitary full-time coach doing 97% of the work, Coach Smith spent his time trying to manage game plans, scouting, and general counseling, as the majority of the team felt their season had been ruined, and had a deep sense of uneasiness about what each day held.

146.    Despite these and other obstacles, Coach Smith led the team to post-season play, taking the Scotties to the region semi-finals before the pandemic ended the season.

147.    After the Kansas City Star identified Coach Smith as the party who made the Title IX complaint, President Fox posted on social media that HCC would authorize an "independent" Title IX investigation regarding the women's basketball program.

148.    The Board hired Husch Blackwell lawyer Demetrius Peterson to conduct the outside investigation.  In or about Spring 2021, Peterson prepared a report to the Board in which, on information and belief, he erroneously asserted that HCC's treatment of the women's coaching staff did not sufficiently deprive the team of an education right or benefit in violation of Title IX.

149.    Peterson in part concluded that: "the College made the decision to suspend and then remove coaches as the result of its internal investigation into the conduct of the employees. . . . Although the Women's Basketball team received less coaching than other athletic teams during

the last nine weeks of its season, that was ultimately *the result of the conduct of its players and coaching staff members and not based on the gender of the student-athletes*." (Emphasis supplied).

150.    Among other faults, Mr. Peterson attempts to blame the coaching staff and team for HCC's violation of Title IX because the obvious disparity in resources was essentially their own fault.  This conclusion is absurd given that neither Plaintiffs nor the team were ever found in violation of the alleged NCJAA rules.

151.    Peterson's conclusion is without support in the law because there is no requirement that a plaintiff show "bad faith, ill will or any evil motive on the part of the [recipient]."  *Elston v. Talladega County Bd. of Educ.*, 997 F.2d 1394, 1406 (11th Cir. 1993), rehearing denied, 7 F.3d 242 (11th Cir. 1993), cert. denied, 502 U.S. 910 (1991), (quoting *Williams v. City of Dothan*, 745 F.2d 1406, 1414 (11th Cir. 1984)).  Thus, whether HCC acted with animus or simply failed to ensure its women's team received equal treatment irrelevant to determining whether it violated Title IX.

152.    Rather, Title IX imposes a requirement that school provide women with the same athletic opportunities as men, including equal treatment.  Here, for example, by forcing Coach Smith the coach his team solo for nearly half the season and refusing to allow him to hire, even on a temporary basis, replacement assistant coaches, HCC violated its duty to treat genders equally. At all relevant times herein, the HCC men's basketball team had a full complement of three coaches, student-assistants, and ample resources.

153.    In addition, as stated further below, Coach Smith is not required to prove an underlying Title IX violation to pursue his present claim for Title IX retaliation.

**The *Perks* Lawsuit**

154.    On March 19, 2020, undersigned counsel and the ACLU of Kansas filed a lawsuit on behalf of four individuals against HCC, VP of Student Services Eric Ingmire, and Bryan Dorrel for pervasive racially hostile and discriminatory treatment of African American students, especially athletes. *See Perks, et al. v. HCC, et. al.*, Case No. 2:20-cv-02129 (D. Kan. 2020).

155.    As set forth in the *Perks* Complaint, HCC had an established policy, custom and practice of subjecting African American student-athletes to discrimination and harassment based on race. HCC has knowingly permitted and maintained a racially hostile environment by targeting African American student-athletes with excessive and unjustifiable scrutiny by law enforcement, intentionally disciplining students in a racially discriminatory manner, and undertaking coordinated efforts to drive them away from the school and limit recruiting to "Kansas kids," almost all of whom have been white since Coach Arnold and Coach Smith were pushed out.

156.    The plaintiffs in *Perks* were young African American men and women who attended HCC during the Fall 2019 semester and who were subjected to rampant racial harassment and discrimination committed or approved by HCC's highest-ranking officials. These officials made demeaning comments about the plaintiffs' "wild hair" and disciplined them for supposed infractions that were forgiven or ignored when committed by white students. The campus security, contracted with the Highland Police Department, has also maintained an official practice of discriminatory searches, surveillance, and harassment of black student-athletes on and off campus. Campus security officers had a practice of surveilling and interrogating Black student-athletes in multiple settings on campus, including driving slowly in their squad car behind them while walking on and off campus.

157.    HCC also disproportionately removed or expelled African American student-athletes for conduct such as "insubordination" and "cursing" even though its own policies prescribe only lesser sanctions for such violations.

158.    Because one of Coach Smith's players was a Plaintiff in *Perks*, as evidenced by postings on social media, rumors swirled around campus that Coach Smith was somehow directing or helping her in connection with the suit.

159.    Upon information and belief, Coach's Smith's perceived support of the *Perks* suit was yet another reason why President Fox retaliated against him by refusing to renew his employment contract.

160.    In January 2021, the parties in *Perks* reached a settlement agreement in which HCC agreed to pay economic damages and to implement specific non-economic terms requested by the plaintiffs.  The non-economic terms included: (a) requiring HCC to conduct mandatory Fourth Amendment and anti-discrimination treatment for its security and campus housing personnel; (b) similar anti-discrimination training for administrative and executive staff; (c) HCC agreed not to permit Highland police from accompanying HCC staff on campus for health reasons or policy violations not criminal in nature; (d) HCC promised to apply policies and discipline equally regardless of race; and (e) HCC is prohibited from expelling students of any gender or face for first-time low to medium policy violations.

161.    On information and belief, HCC breached the *Perks* agreement by failing to implement most if not all the reforms to which it had agreed.  This failure was largely, if not completely, intentional.

162.    Since President Fox was appointed President and Dorrel as Athletic Director, at least 36 coaches and other athletics personnel have either been fired or resigned their employment.

163.    During the same period, the percentage of African American prospective student-athletes who commit to HCC has dropped and continues to drop significantly.

164.    In other words, Defendants' conspiracy to drive away student-athletes of color from HCC continues unabated.  Those that tried to stand in the way became so much collateral damage.

## COUNT I

**(Stigma-Plus Due Process Against Defendant HCC—Property Interest)**

165.    Plaintiffs incorporate the allegations in Paragraphs 1-164 above as if fully set forth herein.

166.    Plaintiffs bring this claim pursuant to 42 U.S.C. § 1983, challenging Defendant HCC's custom, policy and pattern of racially discriminatory practices and racial harassment of African American Student-Athletes and staff, as well as its custom, policy and practice of retaliating against anyone who tries to oppose its agenda.  *See  Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

167.    Section 1983 further allows an individual to bring a civil action against an individual government official who infringes on a constitutionally protected right.  *Elrod v. Burns*, 427 U.S. 347, 359, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976).

168.    The Fourteenth Amendment to the United States Constitution states: "No State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV.   A government employee has a "liberty interest in his good name and reputation as it affects his protected property interest in continued employment." *Workman v. Jordan*, 32 F.3d 475, 480 (10th Cir.1994).

169.     A property interest exists when one has a legitimate claim of entitlement to a right arising from such sources as state statutes, local ordinances, and employment contracts.  *See Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 576, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972).

170.     Plaintiffs each had a protectible property interest in their continued government employment.

171.     Under the Due Process Clause, Plaintiffs were each entitled to procedural due process, which requires a state to employ fair procedures when depriving a person of a protected interest.  At the very minimum, Plaintiffs were guaranteed fair procedures, including notice and the opportunity to be heard.  But Plaintiffs had neither notice of the purported allegations against them, nor a hearing, before being suspended mid-season and soon after their employment terminated.

172.     Defendants' statements falsely accusing Plaintiffs of violating unspecified NJCAA rules regarding academic misconduct impugn Plaintiffs' good name, reputation, honor, and integrity.  The statements were published to other administrators at HCC, the NJCAA, the Board of Trustees, the HCC women's basketball team and their parents, and to the general public on social media and news reports.

173.     The loss of employment or inability to obtain future employment are tangible interests that satisfy the "plus" element of the stigma-plus test.

174.     In suspending Plaintiffs' employment, Defendants failed to accord them due process, including meaningful notice of the allegations against them and the opportunity to be heard.  It also failed to follow and/or breached its own employment policies and procedures.

175.    Before HCC had even completed its so-called "investigation" into alleged NJCAA rules violations—if it did one at all—President Fox demanded that Coaches Smith, Zinn and Ross resign their positions.

176.    Fox, Dorrel and HCC persisted in publishing statements that the Plaintiffs were guilty of "academic misconduct" and did players' homework knowing these allegations were untrue, defamatory and without any factual basis.

177.    Dorrel made several public statements that the alleged, unproven, and ultimately unsubstantiated NJCAA rules violations were the "worst" kind he had ever seen in his "career" (as, it should be noted, one spent as an athletic trainer).

178.    Defendants' statements occurred in the course of suspending and eventually terminating Plaintiffs' employment.

179.    Defendants' defamatory statements have foreclosed other employment opportunities for Plaintiffs in their chosen profession of collegiate coaching.

180.    Since his employment was terminated by HCC, Plaintiff Smith has applied unsuccessfully for every junior college head coach opening nationwide.  In numerous instances, he was directly told by perspective employers that they could not hire him solely because of the alleged NJCAA violations at HCC.  Smith remains unable to find employment in his chosen profession.

181.    Since his employment was terminated by HCC, Plaintiff Ross has applied for a multitude of junior college assistant coaching positions without success.  Like Coach Smith, several prospective employers told him he would not be hired because they falsely understood from HCC that he was involved in academic misconduct.  Ross remains unable to find employment in his chosen profession.

182.     Since his employment was terminated by HCC, Plaintiff Zinn applied for numerous assisting coaching positions without success and was told he would not be hired because of the bogus charge of academic misconduct by HCC.

183.     As a direct and proximate result of Defendants' intentional conduct alleged herein, Plaintiffs incurred serious and lasting damage to their reputations, lost wages and other economic damages, loss of future employment opportunities, and each suffered emotional distress.

## COUNT II
### (Stigma-Plus Due Process Against Defendant HCC—Liberty Interest)

184.     Plaintiffs incorporate the allegations in Paragraphs 1-183 above as if fully set forth herein.

185.     The Fourteenth Amendment protects citizens from being deprived of "liberty" as well as "property" without "due process." *Gwinn v. Awmiller,* 354 F.3d 1211, 1216 (10th Cir. 2004).

186.     Plaintiffs each had a protected interest in their reputations, including a right not to be defamed by government officials in a manner that harms their ability to earn a living or causes damage to their standing and associations in the community.  This is known as a "stigma-plus" claim.

187.     Here, Plaintiffs were defamed by Defendants when falsely accused of violating academic misconduct rules, HCC computer policies and other untrue stigmatizing statements impugning their character, integrity, and reputations, causing them each pain, emotional distress and humiliation.

188.    Plaintiffs each suffered an alteration of their legal status (a "plus") in the form of suspension and termination of their continuing employment without any hearing, no opportunity to clear their names and no semblance of due process.

189.    Defendants' acts and omissions were temporally proximate to what a reasonable person would find to be material adverse employment actions against Plaintiffs.

190.    Although Defendants purported to "investigate" allegations of NJCAA rules violations by the women's basketball coaching staff, they in fact engaged in a charade; namely, HCC failed to interview *a single player*, including the two young women allegedly involved, as well as the coaching staff itself.

191.    HCC's failure to fairly and objectively investigate serious allegations made by Fox and Dorrel also constituted a denial of Plaintiffs' due process rights.

192.    As a direct and proximate result of Defendants' intentional conduct alleged herein, Plaintiffs incurred serious and lasting damage to their reputations, lost wages and other economic damages, loss of future employment opportunities, and each suffered emotional distress.

## COUNT III
### (Violation of 42 U.S.C § 1981 Against All Defendants)

193.    Plaintiffs incorporate the allegations in Paragraphs 1-192 above as if fully set forth herein.

194.    Plaintiffs Zinn and Ross bring this Count for discrimination based on race in violation of their rights prohibited by 42 U.S.C. §1981 against all Defendants.

195.    Plaintiffs Zinn and Ross are African Americans and members of a protected class for purposes of Section 1981.

196.    Plaintiffs Zinn and Ross experienced disparate treatment and harassment at the hands of Defendants because of their intentional discrimination based on race.

197.    Individual Defendants Fox, Dorrel and Karn were each personally involved in the discriminatory acts alleged herein.

198.    Plaintiffs Zinn and Ross both had a contractual relationship with HCC with respect to their employment.

199.    Plaintiffs Zinn and Ross both had a contractual relationship with HCC with respect to their on-campus housing.

200.    Plaintiff Zinn had a contractual relationship with HCC as an enrolled student working on his degree but which contract was breached by HCC, which has since refused to release his academic transcript under the false claim that he continues to owe unpaid tuition.

201.    Defendants took adverse employment action against Plaintiffs by suspending them mid-season without notice.  When Plaintiffs Zinn and Ross refused Fox's demand for their resignations, they were told their contracts would not be renewed for the following year and/or were constructively discharged from their employment.

202.    Plaintiffs' race was a determinative factor in Defendants' actions.

203.    Pursuant to Section 1981, Plaintiffs Zinn and Ross may recover both compensatory and punitive damages, as well as back pay and lost benefits for an unlimited period. *See Johnson v. Ry. Exp. Agency, Inc*., 421 U.S. 454, 461 (1975).

204.    Because of the acts and omissions alleged herein, Plaintiffs Zinn and Ross suffered monetary damages, including but not limited to lost wages and benefits, loss of future employment opportunities, and lost future wages and benefits, as well as incalculable damage to their personal and professional reputations.

205.    Defendants' actions as alleged herein were willful, wanton and done with reckless indifference to Plaintiffs' federally protected rights, entitling them to recover punitive damages against Defendants Fox, Dorrel and Karn in their individual capacities.

206.    As a direct and proximate result of Defendants' intentional conduct alleged herein, Plaintiffs Zinn and Ross incurred serious and lasting damage to their reputations, lost wages and other economic damages, loss of future employment opportunities, and each suffered emotional distress.

<u>**COUNT IV**</u>

**(Retaliation under Section 1981 Against All Defendants)**

207.    Plaintiffs incorporate the allegations in Paragraphs 1-206 above as if fully set forth herein

208.    Plaintiffs bring this Count against all Defendants for retaliation pursuant to Section 1981, which provides in relevant part:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

209.    In other words, Section 1981 "prohibits not only racial discrimination but also retaliation against those who oppose it." *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, —— U.S. ——, 133 S.Ct. 2517, 2529, 186 L.Ed.2d 503 (2013).

210.    Retaliation claims are cognizable under Section 1981, regardless of the plaintiff's race, to anyone who suffers retaliation because he or she tried to help someone else suffering direct racial discrimination.  *See CBOCS West, Inc. v. Humphries*, 553 U.S. 422 (2008).

211.    Plaintiffs engaged in opposition to racial discrimination that is protected under the statute.

212.    A reasonable person would find that the challenged actions were materially adverse.

213.    A causal connection existed between the protected activity alleged by Plaintiffs and the adverse actions.

214.    Defendants took adverse employment action against Plaintiffs by suspending them mid-season without notice and later terminating their employment for engaging in protected activities as defined in Title VI.

215.    Retaliatory animus played a "motivating part" in the above adverse actions taken by Defendants.

216.    There was no legitimate, nonretaliatory reason for Defendants' conduct. Defendants' purported investigation of NJCAA rules violations, internal computer policies, campus housing policies, etc., were transparently pretextual and with no factual or legal basis.

217.    As a direct and proximate result of Defendants' intentional conduct alleged herein, Plaintiffs incurred serious and lasting damage to their reputations, lost wages and other economic damages, loss of future employment opportunities, and each suffered emotional distress.

## COUNT V
### (Retaliation under Title IX Against Defendant HCC)

218.    Plaintiffs incorporate the allegations in Paragraphs 1-217 above as if fully set forth herein.

219.    Plaintiffs bring this Count against HCC for retaliation pursuant to Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681(a) ("Title IX").

220.    Under Title IX and its implementing regulations, "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a); *see also* 34 C.F.R. § 106.31 (Department of Education Title IX regulations); 7 C.F.R. § 15a.31 (Department of Agriculture Title IX regulations); 45 C.F.R. § 86.31 (Department of Health and Human Services Title IX regulations). Title IX's prohibitions on sex discrimination extend to "any academic, extracurricular, research, occupational training, or other education program or activity operated by a recipient" of federal funding. 34 C.F.R. § 106.31; 7 C.F.R. § 15a.31; 45 C.F.R. § 86.31.

221.    Applicable federal regulations provide that interscholastic and intercollegiate athletics are included within the requirements of Title IX:

> No person shall, on the basis of sex, be excluded from participation in, be denied the benefits of, be treated differently from another person or otherwise be discriminated against in any interscholastic, intercollegiate, club or intramural athletics offered by a recipient, and the recipient shall provide any such athletics separately on such basis.

34 C.F.R. § 106.41(a).

222.    HCC is a recipient of federal funding within the meaning of Title IX.

223.    HCC's suspension of the women's basketball coaching staff violated the equal athletic opportunity requirements imposed by Title IX by depriving the women's basketball team of the benefit of an educational program or activity as defined by the statute.

224.    HCC's suspension of Plaintiffs and subsequent termination of their employment was intended to retaliate against them for reporting a potential violation of Title IX caused by unequal treatment of the women's team in the second half of the 2019-20 season.

225.     At all relevant times, among other unequal treatment by HCC, the HCC men's basketball team had one head coach and at least two assistants, while Coach Smith was allowed no assistants and far fewer resources for the women's team.

226.     Because of Defendants' conduct alleged herein, the women's team was deprived of a similar-sized coaching staff and equal institutional support when it suspended two assistant coaches for no apparent reason and refused to let Coach Smith hire replacements.

227.     Defendant HCC is liable for retaliation under Title IX regardless of whether it is later determined there was an underlying violation of the statute.

228.     Defendants' actions were intentional, retaliatory in nature, and designed to place Plaintiffs in fear for their jobs.

229.     As a direct and proximate result of HCC's intentional conduct alleged herein, Plaintiffs incurred serious and lasting damage to their reputations, lost wages and other economic damages, loss of future employment opportunities. Additionally, Plaintiffs have each suffered extreme pain, humiliation, and emotional distress.

## COUNT VI
### (Racial Discrimination under Title VI Against HCC)

230.     Plaintiffs incorporate the allegations in Paragraphs 1-229 above as if fully set forth herein.

231.     Plaintiffs Zinn and Ross bring this Count against Defendant HCC pursuant to the Civil Rights Act of 1964, § 601 et seq., 42 U.S.C.A. § 2000d et seq, against Defendant HCC.

232.     Title VI prohibits recipients, most of which are employers, from discriminating based on race, color, and national origin. Section 601 of Title VI provides that "[n]o person in the United States shall, on the ground of race, color, or national origin, be excluded from participation

in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 42 U.S.C. § 2000d.

233.    Title VI forbids recipients from discriminating in employment if a primary objective of the federal financial assistance to a recipient is to provide employment, or when its employment practices negatively affect the delivery of services to ultimate beneficiaries, including here the student-athletes on the women's basketball team whom Plaintiffs coached.  Both tests apply to HCC in the present case.

234.    Plaintiffs Zinn and Ross are members of a member of a protected class for purposes of Title VI.

235.    As alleged herein, Plaintiffs Zinn and Ross were subject to harassment based on race, color, or national origin, which negatively affected their ability to provide required educational services to HCC student-athlete, the majority of whom are persons of color.

236.    At all times relevant herein, Plaintiffs were engaged in protected activity, including but not limited to objection and refusal to comply with pressure from HCC's administration to refrain from recruiting prospective and current student-athletes of color.

237.    Plaintiffs Zinn and Ross were subject to a pattern of intentional harassment based on race, color or national origin, which negatively affected their ability to provide required educational services to HCC student-athletes, the majority of whom were persons of color.

238.    Defendants took adverse employment action against Plaintiffs by suspending them mid-season without notice and later terminating their employment for engaging in protected activities as defined in Title VI.

239.    Defendants HCC, President Fox and the Board of Trustees intentionally discriminated against Plaintiffs Zinn and Ross based on race.

240.     In the alternative, these Defendants each had actual knowledge of and were deliberately indifferent to the hostile environment of racial harassment suffered by these Plaintiffs.

241.     As a direct and proximate result of Defendants' intentional conduct alleged herein, Plaintiffs Zinn and Ross incurred serious and lasting damage to their reputations, lost wages and other economic damages, loss of future employment opportunities, and each suffered emotional distress.

## COUNT VII
### (Title VI Retaliation Against HCC)

242.     Plaintiffs incorporate the allegations in Paragraphs 1-241 above as if fully set forth herein.

243.     Plaintiffs bring this Count for retaliation against Defendant HCC pursuant to the Civil Rights Act of 1964, § 601 et seq., 42 U.S.C.A. § 2000d et seq.

244.     Title VI does not specifically prohibit retaliation, but courts generally imply a private cause of action for retaliation based on the statute's general prohibition of intentional discrimination. *See Jackson v. Birmingham Bd. of Educ.,* 544 U.S. 167, 173–74, 125 S.Ct. 1497, 161 L.Ed.2d 361 (2005) (Title IX).

245.     HCC can be liable for retaliation by school administrators if they had actual notice of the conduct and did not take corrective action to end the alleged retaliation.

246.     Here, when the women's basketball coaching staff pushed back against HCC's long history of racial harassment of its African American student-athletes, Plaintiffs' employment was suspended in the middle of the basketball season, without notice of the nature of the purported NJCAA academic misconduct allegations, without any meaningful investigation by HCC or any of its agents, and without any hearing or modicum of due process, after which Plaintiffs were notified that their employment contracts would not be renewed.

247.    Plaintiffs were therefore engaged in protected activity under Title VI and suffered adverse action contemporaneous with or after such activity.

248.    Further, there is a direct causal nexus between Plaintiffs' engaging in protected activity and the adverse employment actions alleged herein.

249.    The adverse employment actions taken by HCC were motivated by racial animus in retaliation for Plaintiffs engaging in protected activity challenging HCC's racially discriminatory policies and practices.

250.    Defendant HCC knew of the retaliation against Plaintiffs.  Indeed, Karn and the Board were not just deliberately indifferent of the multitude of abuses by Fox's administration, they actively aided, abetted and affirmatively encouraged them.

251.    As a direct and proximate result of Defendants' intentional conduct alleged herein, Plaintiffs incurred serious and lasting damage to their reputations, lost wages and other economic damages, loss of future employment opportunities, and each suffered emotional distress.

## COUNT VIII
### (Conspiracy under 42 U.S.C. 1985 Against All Defendants)

252.    Plaintiffs incorporate the allegations in Paragraphs 1-251 above as if fully set forth herein.

253.    Plaintiffs bring this claim for civil rights conspiracy under 42 U.S.C. §§ 1983 and 1985(3) against all Defendants.

254.    Section 1985 authorizes a cause of action for damages if the plaintiff is either "injured in his person or property or deprived of having and exercising any right or privilege of a citizen of the United States." 42 U.S.C. 1985(3)

255.     As described more fully above, each of the Defendants conspired, directly or indirectly, to deprive Plaintiffs of their rights under federal law and constitutional right to due process.

256.     In so doing, Defendants took continuing actions in furtherance of this conspiracy, causing injury to Plaintiffs.

257.     The misconduct described herein was undertaken with malice, willfulness, and reckless indifference to the federal constitutional and statutory rights of others.

258.     The misconduct described in this count was undertaken pursuant to the policy and practice of HCC in the manner described more fully in preceding paragraphs.

259.     Defendants Fox, Karn and Dorrel each acted to deny Plaintiffs' federally protected rights with malicious intent and acted with reckless indifference to such rights.

260.     In furtherance of the conspiracy, each of the Defendant co-conspirators committed the overt acts alleged above, including but not limited to falsely accusing and "framing" Plaintiffs for NJCAA rules violations that never occurred, retaliating against Plaintiffs through adverse employment actions and ongoing efforts to destroy their reputations, and deprive them of any semblance of due process

261.     Each of these Defendants was a willful participant in joint activity with an unlawful objective to retaliate and discriminate against Plaintiffs for protected activities taken in support and on behalf of African American student-athletes at HCC.

262.     Defendants each acted for the purpose of concealing their individual actions and/or personal involvement in the alleged deprivations, and intentionally abused their positions to further their conspiracy by attempting to "cover up" their discriminatory conduct.

263.    Accordingly, each of the individual Defendants had an "independent personal stake" in achieving the goals of the conspiracy to deprive Plaintiffs of their federally protected rights and took actions outside the ordinary course and scope of their employment. As such, the "intercorporate conspiracy" has no application to Plaintiffs' Section 1983 and 1985 claims.

264.    As a direct and proximate result of Defendants' joint activity and unlawful actions, Plaintiffs' rights were violated, and each of them suffered severe emotional distress and anguish, as more fully alleged above.

265.    The individual Defendants' acts were willful, wanton and malicious, and done with reckless indifference to Plaintiffs' federally protected rights, entitling Plaintiffs to punitive damages.

266.    As a direct and proximate result of Defendants' intentional conduct alleged herein, Plaintiffs incurred serious and lasting damage to their reputations, lost wages and other economic damages, loss of future employment opportunities, and emotional distress.

## COUNT IX

**(Failure to Protect under 42 U.S.C. § 1986 Against Defendant Karn and the Board)**

267.    Plaintiffs incorporate by reference the allegations set forth in Paragraphs 1-266 above as if fully set forth herein.

268.    Plaintiffs bring this Claim under 42 U.S.C. §§ 1983 and 1986 against Defendants Russell Karn and the Board of Trustees of HCC.

269.    Plaintiffs' constitutional rights were violated as a direct and proximate result of the conspiracy alleged in Count VII.

270.    If these Defendants deny they were a participant in the above alleged conspiracy, then, in the alternative, they are liable under 42 U.S.C. § 1986 for failure, neglect, or refusal to

43

exercise their authority to protect the Plaintiffs from suffering the constitutional deprivations alleged herein.

271.    These Defendants had actual knowledge of each co-defendant's unlawful acts taken in furtherance of the above-alleged conspiracy in violation of 42 U.S.C. § 1985.

272.    The Board of Trustees had the power to prevent or aid in preventing the commission of the § 1985 conspiracy alleged herein.

273.    Defendants deliberately failed to exercise reasonable diligence to prevent commission of the § 1985 conspiracy.

274.    As a direct and proximate result of Defendants' insertional acts, Plaintiffs were deprived of their rights under federal law and the Fourteenth Amendment to the United States Constitution.

275.    The acts and omissions described above were willful, wanton and malicious, and done with reckless indifference to Plaintiffs' federally protected rights, entitling Plaintiffs to punitive damages.

276.    As a direct and proximate result of Defendants' intentional conduct alleged herein, Plaintiffs incurred serious and lasting damage to their reputations, lost wages and other economic damages, loss of future employment opportunities, and emotional distress

WHEREFORE, Plaintiffs pray that this Court conduct a jury trial on their claim, and enter judgment in their favor and against Defendants as follows:

A.    For compensatory damages in whatever amount may be proven at trial under federal and state law;

B.    For punitive damages in an amount to be proven at trial;

C.    For pre- and post-judgment interest as allowed by law;

F.      For reasonable attorneys' fees, including non-taxable litigation expenses;

G.      For costs of suit; and

H.      For such further other relief as the Court may deem just, proper, and appropriate.

### **JURY DEMAND**

Plaintiffs request a jury trial on all issues so triable.

Respectfully submitted,


 /s/ *William C. Odle*
William C. Odle        KS  #14235
The Odle Law Firm, LLC
6 ½ East First Street, Suite 2
Parkville, MO 64152
Tel:    (816) 631-5220
Fax:    (816) 631-5225
Email: wodle@odlelawfirm.com

**ATTORNEY FOR PLAINTIFFS**