# DAN BEEBE GROUP
## STRENGTHENING YOUR TEAM

Date:		January 11, 2022
To:		Bill Odle
From:		Dan Beebe
Re:		Expert Report in *Smith, et al. v. Highland Community College, et al.*

**Relevant Professional Expertise**

I work as a consultant for organizations in addressing human relations risks, especially those involving misconduct such as harassment, discrimination, retaliation, sexual abuse, violations of organizational and association rules. As such, I have been engaged in work to prevent and respond to allegations of numerous types of misconduct. The prevention aspect involves assessing organization's policies, procedures and practices, whereas, the response aspect involves conducting or overseeing investigations of allegations of misconduct.

I have consulted primarily, although not exclusively, with educational institutions, both in K-12 and higher education. In addition, I have been engaged as an independent investigator for the United States Olympic Committee's ("USOC") Center for Safe Sport. I have been trained as a Title IX and Civil Rights investigator and have conducted investigations of such matters. Prior to launching my consulting firms, I was an investigator for the NCAA, a director of NCAA enforcement, after which I served as commissioner of two NCAA Division I conferences (the Ohio Valley and Big 12).

In each of these roles, I have been involved in rules and policy compliance and ensuring the proper processing of investigations to address allegations of misconduct. I have been engaged to help ensure that educational institutions have the proper procedures for responding to allegations of misconduct, including affording those accused of violations the appropriate notice of the allegations against them and the opportunity to be heard. In addition, when employed in the NCAA enforcement department and as

EXHIBIT B

commissioner, I often was contacted by university leaders to about candidates for coaching positions who had been accused of and/or found responsible for violating rules. In summary, my over 40-year career has been dedicated in large part to assisting organizations operate with integrity and fairness.

I previously have served as an expert witness in two cases. As an expert in the state court case of *O'Brien v. Ohio State Univ.*, 2007 WL 2729077 (Ohio 2007), I testified at trial. In the second case, I was deposed but did not testify in court. In both cases, I testified regarding NCAA rules violations and investigations.

**Relationship to Relevant Parties**

I am not acquainted with any of the parties to this action nor witnesses they have identified to date.

**Professional Service Terms**

I have agreed to provide expert witness for the plaintiffs' attorneys for preparatory work as well as appearances in court at the rate of $450 per hour for court time and $250 per hour for out of court time. Payment for services rendered is not contingent upon the outcome of the proceeding. Among the documents I have reviewed include but are not limited to the following: pleadings, documents produced in discovery, audio tape transcripts, collegiate salary data for women's basketball coaches and press articles, *see e.g.* USA Today's March 11, 2022 article "*Tip of the Iceberg: Pay for Women's Basketball Coaches is Skyrocketing. How High Can It Go?*" I understand counsel has provided or will provide all documents relied on for the preparation of this report.

**Effect of Allegations of Wrongdoing for Future College Sports Employment Opportunities**

In my opinion and experience, allegations of wrongdoing limit or eliminate opportunities for coaches or administrators to obtain future employment or advance in college sports. Accordingly, such allegations must be fully and fairly investigated and adjudicated as the stakes are high for those against whom such allegations may be false or exaggerated. I have reviewed evidence communications between HCC internal personnel and with NJCAA personnel regarding conjecture about whether basketball coaching staff improperly engaged in assisting select women's basketball student-athletes with academic requirements;

Page | 2

however, there is no evidence that any of the coaches or student-athletes were provided an opportunity to be heard.

In other words, the evidence I have reviewed in this case as of the writing of this report does not reflect an effort by HCC to provide even rudimentary levels of due process in conducting an investigation of serious allegations that HCC decision-makers claimed as rationale for dismissing the Plaintiffs. I anticipate reviewing additional information disclosed during discovery. However, based on the information reviewed to date, Plaintiffs were suspended prior to HCC conducting a meaningful investigation and their employment was terminated without a process to determine whether the allegations were founded. To make matters worse, ostensibly prior to proper investigation and adjudication of the allegations, HCC officials announced to players, recruits and the public that Plaintiffs were suspended due to alleged NCJAA rules violations. Such publicity is damaging and humiliating personally, and professionally it likely will result in permanent inability to coach again in college sports, unless there is a subsequent announcement that the allegations are unfounded, which was not done in this case. In fact, a news article dated January 8, 2020, in which HCC publicly acknowledged that the coaches were suspended for possible violations indicated HCC would later announce the findings. The record I reviewed and searches I made did not reveal such an announcement. Such foreseeable harm likely will result from malfeasance in failing to properly investigate and adjudicate serious allegations, notwithstanding tremendous competitive success such as the Plaintiffs enjoyed.

**Effect of Suspension on Female Student-Athletes**

HCC chose to suspend the assistant coaches prior to a full and fair adjudication of the allegations of violations. Doing so deprived the women's basketball team of receiving coaching from the same number of coaches as the men's team enjoyed, which possibly violated Title IX. I reviewed documentation indicating that an investigation was conducted by the Husch Blackwell law firm. I would have reviewed the investigation report but as of the filing of this report, it has not been produced pursuant to request to do so by Plaintiff's counsel. Once produced, I will review the report so I can provide an opinion about the rationale for the position that allowing a female team to be deprived the same number of coaches as the male basketball team enjoys is not discrimination based on sex under Title IX.

**Economic Loss to Plaintiffs**

Over the course of my career, I participated in numerous cases involving allegations of rules violations and served on committees that reviewed and improved the processes. Such cases were treated seriously with the accused provided a full and fair process, especially if academic fraud was an element of the case, since the consequences could be severe for the involved institution and individuals. Based on what I reviewed to date, HCC and organizations to which HCC was a member and, as such, and agreed to follow the rules (i.e., the Jayhawk Conference and the National Junior College Athletic Association) did not engage in a full and fair process to determine if allegations against the Plaintiffs were founded. The consequence of this and the fact that HCC publicly claimed the Plaintiffs were being investigated for serious NJCAA rules violations would severely damage the Plaintiffs ability to obtain other employment in college sports.

Based on the competitive and academic success of the women's basketball program conducted by the Plaintiffs, it is reasonable to predict that they would continue to earn a living if not only in the positions they held at HCC, but likely due to their tremendous success, each would have secured even more lucrative positions at four-year schools. Based upon studies and publicity, four-year colleges and universities that compensate coaches at higher levels than do two-year colleges.

In this regard, I have considered issues of economic loss sustained by Plaintiffs based in part on my own personal experience and research into the salaries paid to college women's basketball coaches. As noted, it is reasonable to assume that Coach Ross would have advanced upwards as an assistant coach and ultimately may have become head coach at a four-year institution at either the NCAA or the NAIA level, where coaches' salaries are considerably higher than junior colleges and rising. Assuming Coach Zinn obtained a four-year college degree as he intended to do before his dismissal, he would have been on the same track as Coach Ross for advancement in college coaching. My research thus far indicates the salaries of four-year coaches, assistants, and head coaches, are several thousands of dollars more than that of two-year coaches, with annual salaries ranging from $40,000 to those well-publicized head coaches at the highest level who are making over $2 million. Similarly, assuming Coach Smith continued coaching for ten years, he too has suffered significant economic loss. Even if still at HCC, the increasing salaries paid to women's coaches would contribute to additional lost wages and benefits.

**Conclusion**

Based upon my experiences cited above, that HCC's failure to adhere to its duty to fully and fairly investigate and adjudicate allegations of serious violations along with its public position that the Plaintiffs had committed serious violations resulted in the Plaintiffs' being deprived of opportunities to continue and advance as collegiate women's basketball coaches.

# DAN BEEBE

Walla Walla, WA—214.924.7220—dan@danbeebegroup.com

## Experience

**Dan Beebe Group, founder and president (2011-present)**
I provide a wide range of consulting services, either individually or by working with other expert professionals. I have been trained and certified by the Association of Title IX Administrators (ATIXA) for conducting Title IX and Civil Rights investigations. I have been engaged by universities, school districts and the United States Olympic Committee (USOC) Center for SafeSport to conduct investigations of allegations of discrimination and other forms of misconduct. I also have provided independent evaluations for leaders for their entire organization or certain functions within them relative to preparedness to handle human relations risks, and the effectiveness and culture of administrative structure and workforce.

**PFA Consulting, partner (2011-present)**
As a founding partner for PFA Consulting, my team and I have assisted in providing human relations risk management for universities, as well as for the USOC and an NFL team. With my partners, I have conducted independent assessments of institutional policies, procedures and practices related to preventing and responding to misconduct such as harassment, discrimination, sexual abuse, retaliation, bullying, hazing, emotional and/or physical abuse and violations of NCAA, state and federal rules. I also have trained thousands of students, coaches and staff regarding human relations risks.

**Big 12 Conference, commissioner (2007-2011)**
I was responsible for all aspects of operating this NCAA Division I Football Bowl Subdivision Conference governed by the institutional presidents and chancellors. This included budget development and oversight, media relations, championships, officiating, scheduling, representing the conference in associated organizations (NCAA, Bowl Championship Series, commissioners' groups, etc.), negotiating television, bowl and championship agreements, NCAA compliance, enforcing conference rules, and developing strategy. Among the important assignments in this role, I served on the NCAA Men's Basketball Committee and Bowl Championship Series Committee, including during successful television contract negotiations.

**Big 12 Conference, senior associate commissioner/COO (2003-2007)**
In this role, I was responsible for oversight of budget, legal affairs, NCAA compliance and day-to-day staff operations. I was the liaison to the board of directors (university presidents and chancellors) and was involved in all aspects of conference governance. I participated in negotiations for conference agreements, coordinated development of a strategic plan, revised and enforced sportsmanship policy and carried out all other responsibilities assigned by the commissioner.

**Ohio Valley Conference, commissioner (1989-2003)**
My responsibilities included those listed above in the Big 12 commissioner position to successfully operate this NCAA Division I-AA (now FCS) conference. Working with limited resources, we nonetheless were able to provide outstanding athletics experiences for student-athletes, expanded the league by five members, developed a nationally recognized sportsmanship program, and helped institutions expand opportunities for females.

**NCAA, director of enforcement (1988-1989)**
I supervised investigators and processed infractions cases, which included writing formal inquiries and coordinating presentations before the NCAA Committee on Infractions.

**Wichita State University, assistant director of athletics (1986-1987)**
I was responsible for relations between the athletics department and entities on campus, supervised NCAA rules compliance and academic assistance programs, and monitored student-athlete welfare.

**NCAA, enforcement representative (1982-1986)**
I investigated infractions cases working with NCAA institutions under inquiry, their legal teams, presidents, athletics administrators, faculty representatives and others on campus to resolve serious NCAA rules violations.

## Service and Recognition

**Professional Service:**
- NCAA Division I Men's Basketball Committee
- Bowl Championship Committee
- Collegiate Commissioner's Association (CCA) member and elected as chair of the FBS commissioners
- NCAA Management Council and elected chair of its Division I-AA Governance Committee
- Participant in numerous panels including IMG Sports Business Journal conferences and Knight Commission on Intercollegiate Athletics
- Guest lecturer at graduate- and undergraduate-level classes for various universities
- NCAA Division I-AA Football Championship Committee
- NCAA Enforcement Working Group
- CCA National Letter of Intent Steering Committee
- Tournament Director for 2000 NCAA Men's Basketball South Region Initial Rounds
- NCAA Nominating Committee
- NCAA Professional Sports Liaison Committee
- NCAA Athletics Certification Committee
- Tennessee State University President's Blue-Ribbon Committee to study HBCU institution's intercollegiate athletics program
- Expert witness for the NCAA in *Keller v. NCAA*
- Expert witness for Ohio State University in *O'Brien v. Ohio State*

**Other service:**
- Kansas City Sports Commission Board of Directors
- Nashville Sports Council Board of Directors
- YMCA Board of Directors for Franklin, Tennessee
- Deacon for Kansas City Christian Church
- Volunteer, Walla Walla Child Advocates

**Recognition:**
- OVC Hall of Fame
- Cal Poly Pomona Distinguished Alumnus Award
- 1995 International Sport and Ethics Fellow

## Higher Education

**University of California, Hastings College of Law**
**Juris Doctorate (June 1982)**
Club Rugby Team

**California State Polytechnic University, Pomona**
**Bachelor of Science, Social Sciences (June 1979)**
**Cum laude**
(Transferred to Cal Poly from Walla Walla Community College in March 1977)
Football Team Captain